GATY *et al.*, Plaintiffs in Error, v. PHŒNIX INSURANCE COMPANY, Defendant in Error.

1. A time policy of insurance on a steamboat, which authorized the boat to navigate the usual waters of the Mississippi, Ohio, Illinois, Tennessee and Cumberland rivers, contained this proviso: "Provided, that the steamboat shall not be employed in the cotton trade, unless the consent of this company be obtained and endorsed thereon." *Held*, that the underwriters would not be responsible for a loss of the boat occurring while she was engaged in the cotton trade.

*Error to St. Louis Court of Common Pleas.*

Plaintiffs effected an insurance with the defendant to the amount of $5,000 upon their interest in the steamboat Mayflower against fire and perils of the river for one year from January 20, 1855. In the policy it was provided that it should be lawful for said steamboat, during the continuance of the policy, to navigate the usual waters of the Mississippi, Ohio, Illinois, Tennessee, and Cumberland rivers. It was further provided as follows: " And to proceed to and touch and stay at any places on said waters, if thereunto obliged by stress of weather or unavoidable accidents, or if the same be necessary for the transaction of any lawful business connected with the voyage, without prejudice to the insurance. Provided, that the said steamboat shall not be employed in the cotton trade unless the consent of the company be obtained and endorsed thereon."

The cause was tried by the court without jury. The court made a finding of the facts, which, after setting forth the policy, proceeded as follows: " In the latter part of September, 1855, alterations were made on the Mayflower to make her more convenient for stowing cotton. On the 21st of September, 1855, the officers of the boat caused to be published in the newspaper at Memphis, Tenn., the following advertisements: ' 1855. Mayflower—Joseph Brown, master—Memphis and New Orleans regular Tuesday packet. This new and splendid steamer, built the past season at a cost of more than $100,000, has been placed permanently in the Memphis and New Orleans trade, and will remain the entire season, leaving Memphis on Tuesday, the 20th September, at four o'clock P. M., and every alternate Tuesday thereafter. Shippers may rely on the Mayflower running permanently in and becoming identified with the trade, as hereafter she will be principally owned in Memphis. The passenger accommodations are superior to any on the western waters, having larger rooms, with linen outfits, tables set restaurant style, &c. For freight or passage, apply on board, or to Duval,

Algeo & Co.' = '1855—1856. Memphis and New Orleans—
regular Tuesday packet Mayflower — Jos. Brown, captain—
Henry Filbrun, clerk. The middle deck of this magnificent
steamer having been taken out for the purpose of making
her suitable for the Memphis and New Orleans trade, she
will commence her regular trips about September 25th,
and continue during the season. Shippers may rely on her
remaining permanently in the trade. Duval, Algeo & Co.,
Lavalette & Morris, agents. (Enquirer and Appeal copy.')
About the last of September, 1855, the Mayflower commen-
ced running as a regular packet between Memphis, Tennes-
see, and New Orleans. Her regular day for leaving Mem-
phis was every alternate Tuesday. From the time she com-
menced running in said trade she made five or six trips, and
on each down trip she was loaded chiefly with cotton ; and
the last trip she made from Memphis to New Orleans she had
on board about 3,700 bales of cotton. The principal article
of export from Memphis, and from points below Memphis to
Bayou Sara, is cotton. Cotton is the staple of the country
between the points aforesaid, and constitutes the great bulk
of all freights and cargoes carried by steamboats from Mem-
phis to New Orleans, and a very large proportion of the cot-
ton from Memphis down is carried by the boats running be-
tween Memphis and New Orleans, although transient boats
from the Ohio river and from points above the mouth of the
Ohio river sometimes carry cotton. Cotton trade, as applied
to navigation, is the trade in which boats are engaged when
cotton is the principal article shipped, and the trade from
Memphis, and points as low down as the sugar region, to
New Orleans is the cotton trade. On the 1st of December,
1856, the Mayflower, about 11 o'clock in the forenoon, ar-
rived at Memphis from New Orleans, and on that day made
a contract to carry to New Orleans from Bradley's landing,
about sixteen or eighteen miles above Memphis, from 12,000
to 15,000 sacks of corn, to be carried in parcels of from 3,000
to 6,000 sacks a trip. Accordingly, on the day of her arrival
at Memphis she went up to Bradley's landing, took on board

about 4,800 sacks of corn, which were all that were ready for shipment, and returned to Memphis about 11 o'clock the night of December 1, 1855, which was Saturday, and on the next night, whilst lying at the port of Memphis waiting for Tuesday, her regular day for leaving, with no freight on board except said corn, she was burned and lost. The fire was communicated by the steamboat George Collier, which was also a boat engaged in the cotton trade. The last named boat had just arrived from New Orleans, but neither of the boats had any cotton on board at the time of the fire. The master of the Mayflower refused to contract for carrying cotton as the boat passed up the river to Bradley's landing, but the corn taken at Bradley's landing was not one-fourth of a cargo for the Mayflower, and her officers expected to complete her cargo with cotton, and would have carried, if the boat had not been lost, 3,000 bales of cotton. From the latter part of September to the 1st of December, 1855, the Mayflower was engaged in the cotton trade, and at the time she was burned she only had on board a part of her cargo and intended to complete her cargo with cotton. On the above facts the court decides the plaintiffs are not entitled to recover and that judgment should be for defendant."

*Shepley* and *N. D. Strong*, for appellants.

I. The proviso does not in any manner limit the waters within which the Mayflower was insured by the policy. The boat had the most perfect right to navigate the whole Mississippi river from New Orleans to St. Louis, and any or every part of it. There is no restraint or prohibition. This has no resemblance to the case of a prohibition in a policy from going to a certain place. The boat might have run from Memphis to New Orleans at any time during the year. It is admitted that if the boat had been running from St. Louis to New Orleans, passing over the same waters as she did during the trips from Memphis to New Orleans, that she would be clearly within the policy. The proviso means that the boat shall not have the right to carry cotton, as that is an

article which the insurers deemed hazardous. The carrying of cotton, no matter how many times done, so long as no cotton was on board at the time of the loss, does not vitiate the policy. The carrying of cotton for one trip would not vitiate the policy. If the rule be as contended for, then a majority of the fire policies through this state are void. Most of them require matches to be kept in metallic vessels. There is scarcely an instance where at some period matches have not been kept in other places than a metallic vessel. Are all these policies from that moment to be absolutely void? Most of the policies provide that certain liquids shall only be boiled upon the premises in a particular manner pointed out. If the insured should once boil such liquids in a different way, and a fire should occur months afterwards through means of catching from a contiguous building, would that release the insurers? So also with provisions concerning stove-pipes. Where there is a proviso qualifying the risk, it only suspends the risk during the time of the intervention of the prohibited act. Even if there be evidence warranting the finding of the court that it was the intention of the Mayflower to carry cotton, it is an immaterial finding, for the intention can have nothing to do with the question whether the policy was violated. An intention to deviate does not vitiate a policy. (1 Arnould on Ins. 349.) Though the insurance was for a specific time, yet every voyage stands upon its own merits, and the insurance for the particular voyage can be avoided only by facts happening upon that voyage if the policy ever attached.

*Glover & Richardson,* for respondent.

I. The evidence supports the finding. The stipulation not to engage in the cotton trade was a warranty, and a literal performance of it was necessary. (1 Arn. on Ins. 577, 580; 1 Marsh on Ins. 346.) The warranty is a condition precedent. (1 Marsh. on Ins. 348; 21 Conn. 32; Pet. C. C. 416; 6 Wend. 494; Cowp. 606.) The clause is a promissory warranty. The Mayflower did engage in the cotton trade.

She was engaged in the cotton trade at the time of the loss. If the boat engaged in the cotton trade at any time during the life of the policy, the warranty was broken and the contract at an end. (1 T. R. 187; 7 New York, 530.)

NAPTON, Judge, delivered the opinion of the court.

Upon the facts found by the court, our opinion is that the Mayflower was engaged in the cotton trade at the time of the loss, and therefore the underwriters were not responsible.

The proviso in the policy was not an engagement simply against taking cotton on board the boat, but it was a stipulation that the boat would not, without the consent of the underwriters, engage in the cotton trade. If the intention was merely to prohibit cotton as an article of freight, it is apparent that a very unusual mode of expressing that intention was resorted to. Would a boat running from St. Louis to New Orleans, taking on board the articles which usually constitute the freight between these points, forfeit its policy, with a proviso like the present, by bringing up a bale of cotton from New Orleans? Such was not, we think, the design of the prohibition. It was levelled against the cotton trade, not against an actual shipment of cotton on the boat whilst engaged in another trade.

Objections may exist against insuring a boat in a particular trade, altogether distinct from any objections to the character of the freight which that trade might imply.

What constituted the "cotton trade" appears to be very well understood among persons engaged in our river navigation. Boats engaged in that trade are constructed or fitted up with reference to its demands. The Mayflower was altered with a view to the requirements of this trade, and was engaged in the trade for several months previous to her destruction by fire.

A permission to navigate the waters of the Mississippi, Ohio, Illinois, Tennessee and Cumberland rivers, contained in the policy, was not at all inconsistent with the prohibition against running in the cotton trade. The boat might have

been a regular packet from this port (St. Louis) to Nash-ville, or Memphis, or New Orleans, and not, according to the evidence of all the witnesses, engaged in what is known as the cotton trade. To carry a single bale of cotton from Nashville to St. Louis does not imply that the boat is engaged in the cotton trade.

If the boat had left the cotton trade and embarked in a trade not prohibited, and an injury had been sustained cover-ed by the policy whilst engaged in the trade allowed, the question would have been raised whether the previous breach of the stipulation did not wholly discharge the underwriters from liability. There is no doubt that in policies covering a single voyage a breach of a warranty would discharge the insurers, whether the loss had any connection with that breach or not. That rule is well established, however harsh its application may seem in particular cases. The principle was no doubt fixed with a view to ocean navigation, where disasters usually occur far from the observation of any human eye except of those who are the agents of the in-sured. Whether the principle ought to be applied to what are called time policies in our river navigation, is not neces-sary to be determined. The liability in such cases, like that of innkeepers under the common law, would be a strict and perhaps a harsh one; but not more so than the well settled law which exempts the underwriter from all responsibility where a ship is warranted to sail on one day and does not sail until the next. It is difficult to trace a shipwreck occur-ring perhaps six months after the commencement of the voyage to the fact that she weighed anchor the day after or before her policy required.

It is unnecessary, in the view taken of this case, to discuss the distinction between warranties and representations. The name by which the stipulation in this policy may be called will not change its character. It was clearly a declaration on the part of the underwriters that they would not be re-sponsible for losses occurring whilst the boat was engaged in the cotton trade. The disaster happened when she was run-

ning in that trade. Whether there was any connection between the loss and the breach of the engagement is immaterial. It occurred when the boat was actually in default, and it is well settled that in such cases it is not incumbent on the insurers, in order to exempt themselves from liability, to be able to trace the loss to the default. It is like a case of deviation, where no inquiries will be allowed as to whether the accident might not have happened had the boat remained in her course.

Judgment affirmed. Judge Ewing concurs.